# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
### EASTERN DIVISION

INDIAN HARBOR INSURANCE       )
COMPANY,                      )
                             )
    Plaintiff,        )
                             )
    vs.               )     **Case No. 4:07CV581MLM**
                             )
CLARINET, LLC,                )
                             )
    Defendant.        )

## MEMORANDUM OPINION

Before the court are the Motion for Partial Summary Judgment as to Coverage and the Motion for Partial Summary Judgment as to Policy Limits filed by Defendant Clarinet, LLC, ("Clarinet"). Doc. 61, Doc. 59. Plaintiff Indian Harbor Insurance Company ("Indian Harbor") filed a Response to each of Clarinet's Motions. Doc. 73, Doc. 76. Clarinet filed a Reply to each of Indian Harbor's Responses. Doc. 78, Doc. 79. Also before the court is the Motion for Summary Judgment filed by Indian Harbor.[1] Doc. 69. Clarinet filed a Response to Indian Harbor's Motion. Doc. 75. Indian Harbor filed a Reply. Doc. 77. The parties have consented to the jurisdiction of the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). Doc. 17.

## I.
## FACTS[2]

Clarinet purchased the Switzer Building on July 7, 2005. The Switzer Building is a turn of the century structure which consisted of two buildings, a main structure, and an annex. The main

---

[1]    In its Motion for Summary Judgment Indian Harbor addresses both coverage and policy limits.

[2]    The facts are undisputed unless otherwise stated.

structure was a six story building with a story below grade. The building was generally of masonry construction supported by a combination of wooden and steel internal structural framing members. Clarinet intended to convert the Switzer Building into luxury apartments with street level retail and commercial space.

Clarinet asked Affiliated Insurance ("Affiliated") to purchase insurance for the Switzer Building. Affiliated contacted Partner's Specialty Group ("PSG") in this regard. PSG had an agreement with Indian Harbor whereby PSG was an independent contractor without authority to represent or bind Indian Harbor. Affiliated completed an application for insurance for the Switzer Building and forwarded it to PSG. PSG then forwarded the application for insurance for the Switzer Building to Indian Harbor.

A document titled "Builders Risk Application" dated July 6, 2005, on PSG's letterhead, states that the Insured was Clarinet and that Clarinet was seeking coverage for "WINDSTORM." A Renovation Supplement to Builders Risk Application on PSG's letterhead states that the "Purchase Price/Limit for Existing Building" was $588,000. Pl. Ex. 71. An e-mail from Terina AuBuchon, of Affiliated, dated July 6, 2005, states:

> The insureds are purchasing the existing structure for $588,000, getting a loan for 7.5mm which is what I need the completed value of the building to be. The appraisal that was done on the project actually states the "wholesale value of the building" will be $8,608,000. I will go with a $5,000 deductible on this i[f] you can offer it. do you need further apps from me?

Pl. Ex. 71.

A July 7, 2005 e-mail to Teresa Richter, Property Assistant for PSG, from Ms. AuBuchon states, "hard cost 6,500,000 - can I have quote this am?" Pl. Ex. 74. Ms. Richter's responding e-mail states, "and hard costs is $6,500,000 or is the total value[] $8,500,000." Pl. Ex. 74. "WKF&C is the

managing general underwriter for Indian Harbor and, for intents and purposes, is Indian Harbor as far as the issuance of policies." Clarinet Fact ¶ 69. "WKF&C, on behalf of Indian Harbor, issued a quote to PSG." Def. Fact ¶ 19. A New Business-Binder/Invoice, dated July 7, 2005, sent by WKF&C to PSG states that, "[i]n accordance with your submission," "[t]his will confirm that coverage has been bound as follows." The New Business-Binder/Invoice further states that the named insured was Clarinet; that the policy limit was "$8,088,000 Per Schedule"; that the Valuation was "FRC-existing/RC-renovations"; and that the Policy was effective July 7, 2005, to July 7, 2006. Pl. Ex. 75.

PSG sent Quote #13140A, on PSG's letterhead and dated July 7, 2005, to Affiliated. Pl. Ex. 76. Quote #13140A states that coverage was for "Real Property" and that the "Limits" were "$8,088,000 per occurrence," "Current Structure - $588,000 per occurrence," "Hard Costs - $6,500,000 per occurrence," and "Soft Costs - $1,000,000 per occurrence." Quote #13140A also states that it was "Subject To" "Favorable Inspection Reports" and "Receipt of signed Accord Application"; that "Limits shown are Scheduled, NOT BLANKET"; that "NO FLAT CANCELLATIONS"; that the "quote is based upon application submitted to the Company and may not include all terms and conditions requested"; and that the premium was $25,095.00. Pl. Ex. 76.

An e-mail, dated July 7, 2005, from Ms. AuBuchon addressed to PSG states, "Please bind the Property quote that is attached." Pl. Ex. 78.

On or about July 20, 2005, Indian Harbor's Chicago office completed policy forms which were delivered to PSG by Indian Harbor's Kansas City office. PSG then delivered a policy (the "Initial Policy") to Affiliated, which reviewed it for accuracy and sent it to Clarinet. The Initial Policy expired by its own terms on July 7, 2006. The Initial Policy effective July 7, 2005, to July 7, 2006,

provided that in the event of loss or damage to the Covered Property, Clarinet was required to, among other things, "[a]s soon as possible give [Indian Harbor] a description of how, when, and where the loss or damage occurred"; "[t]ake all reasonable steps to protect the Covered Property from further damage"; at Indian Harbor's request, give a "complete inventory of the damaged and undamaged property," including "quantities, costs, values and amount of loss claimed"; and "cooperate with [Indian Harbor] in the investigation or settlement of the claim." Pl. Ex. 83, Initial Policy at 4-5.

The Causes of Loss - Special Form of the Initial Policy states as follows:

B. Exclusions:

1. We will not pay for loss or damage caused directly or indirectly by any of the following. *Such loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss.*

(emphasis added). Pl. Ex. 83.

The Initial Policy includes in Exclusions listed in Paragraph B.1(a)-(h) such events as "Earth Movement" and "Governmental Action" which are not at issue in the matter under consideration.

The Causes of Loss - Special Form lists in Paragraph B.2(a)-(m) additional losses which are not covered under the Initial Policy. Paragraph B.2 states that "[w]e will not pay for loss or damage caused by or resulting from any of the following." This paragraph does not include the proviso of Paragraph B.1 which states that the losses incurred as a result of the Exclusions in B.1 are excluded regardless of any other cause of event which contributes concurrently to the loss. In particular, Paragraph B.2(d)(2) states that coverage will not be provided where loss or damage is caused by or results from, among other things, "[r]ust or other corrosion, decay, deterioration, hidden or latent defect *or any quality in property that causes it to damage or destroy itself*" and "settling cracking,

4

shrinking or expansion." (emphasis added). Paragraph B.2(d)(2)(k) also states that coverage will not be provided for loss or damage caused by "Collapse, except as provided below in the Additional Coverage for Collapse. But if collapse results in a Covered Cause of Loss at the described premises, we will pay for the loss or damage caused by the Covered Cause of Loss."

The Causes of Loss - Special Form in the Initial Policy states, under Exclusions, at Paragraph B.3 that:

> We will not pay for loss or damage caused by or resulting from any of the following, 3.a. through 3.c. But if an excluded cause of loss that is listed in 3.a. through 3.c. results in a Covered Cause of Loss, we will pay for the loss or damage caused by that Covered Cause of Loss.
> ...
>
> c. Faulty, inadequate or defective:
>
> (1)  Planning, zoning, development, surveying, siting;
> (2)  Design, specifications, *workmanship, repair, construction, renovation, remodeling*, grading, [or] compaction,
> (3)  *Materials used in repair, construction, renovation or remodeling;*
> (4)  *Maintenance*;
>
> of part or all of any property on or off the described premises.

(emphasis added).

The Initial Policy also provides, in section D of the Causes of Loss - Special Form, that Indian Harbor "will pay for direct physical loss or damage to Covered Property caused by collapse of a building or any part of a building that is insured ... if the collapse is caused by one or more of the following:"

> a.  The specified causes of loss or breakage of glass, all only as insured against in this Coverage Part;
>
> b.  Decay that is hidden from view, unless the presence of such decay is known to an insured prior to collapse.

...

f.      Use of defective material or methods in construction, remodeling or renovation if the collapse occurs during the course of construction, remodeling or renovation.  However, if the collapse occurs after construction, remodeling or renovation is complete and is caused in part by a cause of loss listed in 2.a. through 2.e., we will pay for the loss or damage even if use of defective material or methods, in construction, remodeling or renovation contributes to the collapse.

The criteria set forth in 1.a. through 1.d. do not limit the coverage otherwise provided under this Causes of Loss Form for causes of loss listed in 2.a., 2.d and 2.e.

The Causes of Loss - Special Form at Paragraph D defines "Collapse."  Paragraph G.2 states that "Specified Causes of Loss" include "windstorm."  The Initial Policy does not define windstorm.

Also, the Builders Risk Coverage Form includes the following provision in Paragraph F.3:

**Restriction of Additional Coverage - Collapse**

If the causes of Loss - Broad Form is applicable to this coverage form, Paragraph C.2.f. of the Additional Coverage - Collapse does not apply to this coverage form.

If the Causes of Loss - Special Form is applicable to this coverage form, Paragraph D.2.f. of the Additional Coverage - Collapse does not apply to this coverage form.

The Initial Policy includes a Functional Replacement Cost Endorsement, which states that "this endorsement modifies insurance provided under ... building and personal property coverage form." The Functional Replacement Cost Endorsement states that it was for "real property"; that *the "Limit of Insurance"* was *"$8,088,000"*; that the "Functional Replacement Cost replaces Actual Cash Value in the VALUATION Loss Condition for the property described in the Schedule or the Declarations"[3]; and that Functional Replacement Cost "means the cost to replace the property with similar property

---

[3]      The Location Schedule in the Initial Policy provided that Coverage for "Real Property" was $588,000" with an FRC Valuation; that Coverage for "Renovations" was "$6,500,000" with an "RC" Valuation; and that Coverage for "Soft Costs" was "$1,000,000" with an "RC" Valuation."

intended to perform the same function when replacement with identical property is impossible or unnecessary." The Functional Replacement Cost Endorsement states:

> D. *We will not pay on a Functional Replacement Cost basis for any loss or damage:*
>
> 1. *Until the lost or damaged property is actually repaired or replaced*; and
>
> 2. Unless the repairs or replacement are made as soon as reasonably possible after the loss or damage.
>
> E. We will not pay more for loss or damage on a Functional Replacement Cost basis than the least of:
>
> 1. The Limit of Insurance applicable to the lost or damaged property;
>
> 2. The cost to replace, on the same premises, the last or damaged property with other property used for the same purpose; or
>
> 3. The amount you actually spend that is necessary to repair or replace the lost or damaged property.

(emphasis added).

In regard to renewal of the Initial Policy, Matt Brott of PSG testified in a deposition that Affiliated asked for a "renewal quote based on last year [sic] information." Bott Dep. at 51. Bott testified that upon requesting a quote he "would refer to the limits that we currently have on the policy and ask that they be written again." Bott Dep. at 51. WKF&C sent to PSG a document titled Renewal Business, signed by Dave Schuhler, former Vice President of WKF&C, and dated July 6, 2006. Pl. Ex. 84. This document states that WKF&C was "pleased to provide" a quotation; that the policy limit was $8,088,000 "per schedule"; that the Valuation was "FRC - existing/RC - renovation"; that the issuing company was Indian Harbor; that the effective date was July 7, 2006; that the expiration date was October 7, 2006; and that the agreement was "Subject to Inspection and Receipt of signed Accord application." Pl. Ex. 84.

A Cover Note to PSG, dated July 6, 2006, signed by Mr. Schuhler of WKF&C states that "in accordance with [PSG's] submission," "[t]his will confirm that coverage has been bound as follows." The Cover Note further states that the "Issuing Company" was Indian Harbor; that Clarinet was the "Named Insured"; that the Policy Limit was $8,088,000; and that the Valuation was "FRC - existing/RC - renovations." Pl. Ex. 86. Under the heading "Comments," the Cover Note stated "Subject to Inspection and Receipt of signed Accord application. Pl. Ex.86.

PSG sent, on its letterhead, Quote #16772A to Ms. AuBuchon, Account Manager for Affiliated. Pl. Ex. 85. Quote #16772A, dated July 6, 2006, states that the Insurer was Indian Harbor; that the Insured was Clarinet; that the limit was $8,088,000, per occurrence; that this limit included $588,000 per occurrence for "Current Structure," $6,500,000, per occurrence for "Hard Costs," and $1,000,000 per occurrence for "Soft Costs"; that the Valuation was "Replacement Cost - Renovations" and "Functional Replacement Cost - Existing Structure"; that the conditions were subject to "Favorable Inspection Reports" and "Receipt of signed Accord Application/Vacant Property Ap prior to binding"; that " Limits shown are Scheduled, NOT BLANKET"; and that "[t]his quote is based upon applications submitted to the Company and may not include all terms and conditions requested." Pl. Ex. 85. Quote #16772A additionally states, "PLEASE REFER TO THE POLICY FORM FOR FULL DETAILS ON TERMS AND CONDITIONS." Pl. Ex. 85.

A Binder dated July 7, 2006, on PSG's letterhead states that in accordance with "your instructions, we have effectuated insurance." This Binder does not reflect to whom it was directed. The July 7, 2006 Binder states that the Binder and Policy Periods were from July 7, 2006, to October 7, 2006; that Indian Harbor was the Insurer; that Clarinet was the Insured; that the Policy Limits were $8,088,000 per occurrence, which included $588,000 per occurrence for "Current Structure,"

8

$6,500,000 per occurrence for "Hard Costs," and $1,000,000 per occurrence for "Soft Costs"; that the Valuation was "Replacement Cost - Renovations" and "Functional Replacement Cost - Existing Structure"; and that the Binder was subject to "Receipt of signed Accord Application/Vacant Property Ap prior to binding." Pl. Ex. 87. Further, the Binder states as follows: "*[f]orms applicable are subject to the terms, conditions and limitations of the policy(ies) or certificate(es) in current use by the company, unless otherwise specified*"; the "binder is issued by PSG without liability whatsoever as an insurer"; the "binder will be terminated and superseded upon delivery of formal policy(ies) or certificates issued to replace it"; and "PLEASE REFER TO THE POLICY FORM FOR FULL DETAILS ON TERMS AND CONDITIONS." (emphasis added).

On July 19, 2006, a storm passed through St. Louis, during which the Switzer Building partially collapsed. Indian Harbor had not issued a physical renewal policy at the time of the storm.

A Fax receipt reflects that on July 26, 2006, a document titled "Accord," "Commercial Insurance Application," was faxed to Affiliated and that the relevant property was the Switzer Building. Pl. Ex. 89.

Subsequently, in either August or September 2006, Clarinet received a copy of the Extension Policy. The Extension Policy includes Endorsement #1 which is dated September 6, 2006. Endorsement #1 states that it was an "Amendatory Endorsement" and further states that:

Location #1 - 612 North First Street is amended to show:

Real Property - $588,000 - Valuation FRC
Renovation - $6,500,000 - Valuation RC
Soft Costs - $1,000,000 - Valuation RC
The Schedule of Forms is Amended to include the following forms:

Builders Risk Coverage Form ...
Functional Building Valuation Form ...

9

> Cancellation Changes Form ...
> ...
> See attached location schedule and forms.
> Policy TIV remains at - $8,088,000 with no change in premium.

Pl. Ex. 95.

The Location Schedule attached to Endorsement #1 states that Coverage for "Real Property" was $588,000 with a Valuation being "FRC"; that Coverage for "Renovations" was $6,500,000 with Valuation being "RC"; and that coverage for "Soft Costs" was $1,000,000 with Valuation being "RC." The Functional Building Valuation Form attached to Endorsement #1 states that the "Limit of Insurance is $588,000." This Form further states:

> A.    The Limit of Insurance shown in the above Schedule is the only limit of insurance applicable to the building described in the above Schedule.
> ...
> C.    With respect to the building described in the above Schedule, the following replaces items a. and b. of the Valuation Loss Condition:
>
>> 1.    If you contract for repair or replacement of the loss or damage to restore the building shown in the above Schedule for the same occupancy and use, within 180 days of the damage unless we and you otherwise agree, we will pay the smallest of the following, a., b., c., or d.:
>>
>> a. The Limit of Insurance shown in the above Schedule as applicable to the damaged building;
>>
>> b. In the event of a total loss, the cost to replace the damaged building on the same site (or on a different site if relocation is required ..., with a less costly building that is functionally equivalent to the damaged building.
>>
>> c. In the event of partial loss:
>>
>>> (1) The cost to repair or replace the damaged portion of the building with less costly material ...; and
>>>
>>> (2) The amount you actually spend to demolish and

10

clear the site of undamaged parts of the building as described in Paragraph E.2.b. below.

    d.  The amount you actually spend:

        (1) That is necessary to repair or replace the lost or damaged building with less costly materials if available; and

        (2) To demolish and clear the site of undamaged parts of the building as described in Paragraph E.2.b. below.

2. If you do not make a claim under Paragraph 1 above, we will pay the smallest of the following, a., b., or c.:

    a.  The Limit of Insurance shown in the above Schedule as applicable to the damaged building;

    b.  The "market value" of the damaged building, exclusive of the land value, at the time of the loss; or

    c.  The amount it would cost to repair or replace the damaged building on the same site, with less costly material ... less allowance for physical deterioration and depreciation.

Pl. Ex. 95.

An e-mail, dated August 24, 2006, from Ms. AuBuchon of Affiliated to St. Johns Bank states, in regard to the Switzer Building, "please find enclosed a copy of a certificate of insurance we issued on your behalf." Pl. Ex. 91. The attached "Evidence of Personal Property Insurance" states that the coverage included $588,000 for "Current Structure," $6,500,000 for "Hard Cost," and $1,000,000 for "Soft Cost." Pl. Ex. 91.

An e-mail to Richard Darragh of Pegasus Development, dated September 20, 2006, from Ms. AuBuchon states that the Builders Risk policy for Clarinet had been renewed for three months and that "le[ft] the renewal date at 10-07-2006." Ms. AuBuchon's e-mail further states:

As a note the inspectors of the property stated that the renovations of the building had never gotten started at the time of the loss but minor clean up was occurring. How true this is I don't know I thought that some demolition had occurred prior to the lost. [sic] This isn't a big issue just letting you know how the file reads, we may have to provide documentation on any renovations that may have been done.

Pl. Ex. 96.

An e-mail, dated September 21, 2006, from Mr. Darragh to Ms. AuBuchon states:

I have sent the adjusters a great deal of information to date. They requested more information today that will be mailed out Monday.

Work in the building prior to the storm was demolition of specific spots within the building, stabilization of the main columns and beams and remediation of selected materials. We considered that Phase 1 of a three phase project with the other 2 phases being core and shell and build out construction. We were approximately 90% through phase 1 when the storm hit.

Pl. Ex. 96.

Indian Harbor denied coverage for the collapse of the Switzer Building. Indian Harbor retained WJE, an engineering firm, and Clarinet retained Thomas L. Rewerts, each of whom opined regarding the circumstances and the causes of the collapse of the Switzer Building.

In the matter before the court Indian Harbor asserts that coverage should be denied on the following grounds: Clarinet has not shown that the building collapsed as a result of the windstorm; the Builders Risk Policy issued by Indian Harbor does not provide for coverage for losses caused by inadequate, faulty, or defective workmanship or methods of construction and/or renovation; the Switzer Building would not have collapsed if it had been maintained in a reasonable condition; the collapse of the Switzer Building was caused by Clarinet and/or its contractors' failure to provide adequate bracing to the structure and by their modification of the interior structure of the building; Clarinet has not shown that the windstorm was a proximate cause of the collapse; and Clarinet

materially breached its duty under the Initial Policy to cooperate during the claims process.

In regard to coverage, Clarinet contends that the Switzer Building collapsed as a result of the windstorm, and that, even if defective renovation and construction contributed to the collapse, the Initial Policy provides for coverage where the windstorm was a direct cause of the collapse. Clarinet further contends that it cooperated during the claims process.

In regard to the amount of coverage, Indian Harbor contends that if the court determines that coverage exists, such coverage is limited to $588,000 under the Functional Building Valuation provision of the Extension Policy. Alternatively, Indian Harbor contends that if the Initial Policy applies and if the Functional Replacement Cost provision of the Initial Policy is applicable, Clarinet cannot recover until it rebuilds. Clarinet contends that the Initial Policy applies; that it was not a party to the terms of the Extension Policy; and that pursuant to the Functional Replace Cost Endorsement of the Initial Policy, it is entitled to $8,088,000 coverage. Clarinet also argues that it need not rebuild to recover.

## II.
## STANDARD FOR SUMMARY JUDGMENT

The court may grant a motion for summary judgment if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The substantive law determines which facts are critical and which are irrelevant. Only disputes over facts that might affect the outcome will properly preclude summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Summary judgment is not proper if the evidence is such that a

reasonable jury could return a verdict for the nonmoving party. Id. See also Fenny v. Dakota, Minn.& E.R.R. Co., 327 F.3d 707, 711 (8th Cir. 2003) (holding that an issue is genuine "if the evidence is sufficient to allow a reasonable jury to return a verdict for the non-moving party").

A moving party always bears the burden of informing the court of the basis of its motion. Celotex, 477 U.S. at 323. Once the moving party discharges this burden, the nonmoving party must set forth specific facts demonstrating that there is a dispute as to a genuine issue of material fact, not the "mere existence of some alleged factual dispute." Fed. R. Civ. P. 56(e); Anderson, 477 U.S. at 247. The nonmoving party may not rest upon mere allegations or denials of his pleading. Anderson, 477 U.S. at 256. "Factual disputes that are irrelevant or unnecessary" will not preclude summary judgment. Id. at 248.

In passing on a motion for summary judgment, the court must view the facts in the light most favorable to the nonmoving party and all justifiable inferences are to be drawn in its favor. Id. at 255; Raschick v. Prudent Supply, Inc., 830 F.2d 1497, 1499 (8th Cir. 1987). The court's function is not to weigh the evidence, but to determine whether there is a genuine issue for trial. Anderson, 477 U.S. at 249. However, "[t]he mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient." Id. at 252. With these principles in mind, the court turns to an analysis of the parties' motions.

## III.
## INSURANCE POLICIES UNDER MISSOURI LAW

Missouri law provides that a court interpreting an insurance policy should give the policy's language "'its plain meaning, which is the meaning that would ordinarily be understood by a layperson who bought the policy.'" Haulers Ins. Co., Inc. v. Wyatt, 170 S.W.3d 541, 546 (Mo. Ct. App. 2005)

(quoting <u>Tapley v. Shelter Ins. Co.</u>, 91 S.W.3d 755, 757 (Mo. Ct. App. 2002)). "Ambiguous provisions of an insurance policy are construed against the insurer." <u>Id.</u> (citing <u>Am. Standard Ins. Co. of Wis. v. May</u>, 972 S.W.2d 595, 602 (Mo. Ct. App. 1998)). Further, ambiguous policy language must "be interpreted in the manner that would ordinarily be understood by the lay person who bought and paid for the policy." <u>Haggard Hauling & Rigging Co., Inc. v. Stonewall Ins. Co.</u>, 852 S.W.2d 396, 399 (Mo. Ct. App. 1993) (citation omitted). On the other hand, "unambiguous provisions will be enforced as written." <u>American Standard</u>, 972 S.W.2d at 602 (citing <u>Haggard Hauling</u>, 852 S.W.2d at 399). Whether ambiguity exists is a matter of law for the court to decide. <u>Haulers Insurance</u>, 170 S.W.3d at 545 (citing <u>Martin v. U.S. Fid. and Guar. Co.</u>, 996 S.W.2d 506, 508 (Mo. 1999) (en banc)).

"When there is 'duplicity, indistinctness or uncertainty in the meaning of the words used in the insurance policy,'" ambiguity exists. <u>Id.</u> (quoting <u>Tapley</u>, 91 S.W.2d at 757). In particular, where a policy "promises something in one point and takes it away in another, there is resultant ambiguity," which is construed against the insurance company. <u>Murray v. Am. Family Ins. Co.</u>, 429 F.3d 757, 764 (8th Cir. 2005). Further, "[p]olicy provisions designed to restrict, limit or impose exceptions or exemptions on insurance coverage will be strictly construed against the insurer." <u>Id</u>. Upon construing specific language of an insurance policy a court "must consider the policy as a whole" and must "interpret the policy language in a manner [] consistent with the reasonable expectations, objectives, and intent of the parties.'" <u>Haulers</u>, 170 S.W.3d at 546 (citing <u>American Standard</u>, 972 S.W.2d at 602) and (quoting <u>Am. Family Mut. Ins. Co. v. Bramlett</u>, 31 S.W.3d 1, 4 (Mo. Ct. App. 2000)).

Also, "[i]n Missouri, the burden of showing that the loss and damages are covered under the insurance policy is placed on the plaintiff; the burden of showing that there is an applicable exclusion

is on the defendant insurer." <u>Am. States Ins. Co. v. Herman C. Kempker Const. Co.</u>, 71 S.W.3d 232, 235 (Mo. Ct. App. 2002) (citing <u>Am. States Ins. Co. v. Mathis</u>, 974 S.W.2d 647, 649 (Mo. Ct. App. 1998). <u>See</u> <u>also</u> <u>State Farm Mut. Ins. Co. v. Stockley</u>, 168 S.W.3d 598, 600 (Mo. Ct. App. 2005). A term in an exception to an exclusion is "construed against the insurer, not the insured." <u>Macheca Transp. Co. v. Phila. Indem. Ins. Co.</u>, 463 F.3d 827, 832 (8th Cir. 2006) (citing <u>Century Fire Sprinklers, Inc. v. CNA/Transp. Ins. Co.</u>, 23 S.W.3d 874, 877 n. 1 (Mo. Ct. App. 2000)).

## IV.
## COVERAGE

As stated above, Indian Harbor contends that Clarinet is not entitled to coverage for the collapse of the Switzer Building and Clarinet contends that it is. It is undisputed that Clarinet and Indian Harbor intended to renew the insurance on the Switzer Building. The parties also do not dispute that the provisions applicable to the issue of coverage are as stated in the Initial Policy.[4] As such, the court will reference the Initial Policy for purposes of considering the pending Motions to the extent they address coverage.

### A.      Windstorm:

Clarinet contends, and Indian Harbor asserts to the contrary, that the Switzer Building collapsed as a result of a windstorm and that a windstorm is a covered cause of loss. The Initial Policy unambiguously states that collapse of a building is covered where the cause of the loss is a windstorm. <u>See</u> Causes of Loss - Special Form, ¶ D.2, ¶ G.2. In regard to whether a cause of the collapse of the Switzer building was a windstorm, Clarinet bears the burden of establishing that this covered cause of loss was the cause of the collapse. <u>See</u> <u>Stockley</u>, 168 S.W.3d at 600; <u>Kempker Construction</u>, 71

---

[4]      The parties dispute whether the Initial Policy, the Extension Policy, and/or terms stated in correspondence are applicable to a determination of policy limits.

S.W.3d at 235.

First, the parties dispute the meaning which should be given to "windstorm," which is not defined in the Initial Policy. In regard to the definition of a windstorm under Missouri law, the court in Brown v. Pa. Fire Ins. Co., 263 S.W.2d 893, 897 (Mo. Ct. App.1954) held:

> In the first case in this state involving the definition of a "windstorm" this court in Schaeffer v. Northern Assurance Co., Mo. App., 177 S.W.2d 688, loc. cit. 691, said:
>
>> The term "windstorm" has never been judicially defined in this state so far as we are advised. It is a simple term and is defined by Webster as 'a storm characterized by high wind with little or no precipitation. *The term as used in a policy of insurance* such as that with which we are here concerned means a *wind of unusual violence*. It is something more than an ordinary gust of wind or current of air no matter how long continued. It need not have the violence or the twirling or whirling features of a cyclone or tornado, but it must assume the aspects of a storm, that is, an outburst of tumultuous force. Jordan v. Iowa Mut. Tornado Ins. Co., 151 Iowa 73, 130 N.W. 177, Ann.Cas.1913A, 266.
>
> In Metropolitan Ice Cream Co. v. Union Mut. Fire Ins. Co., Mo. App., 210 S.W.2d 700, after adopting the definition in the Schaeffer case, supra, the court at pages 702 and 703 said:
>
>> This seems to sufficiently define it. Windstorms, like any other kind of storms, vary in violence and policies *must be construed to cover a windstorm of any force and turbulence*. If an insurer wishes to limit its liability to damages caused by storms of certain measured velocity or duration the policy should so state. ... As to whether or not a windstorm caused the damages was a question for the jury as it was an issue of fact.

(emphasis added).

Significantly, the Initial Policy does not assign a velocity or duration to a covered windstorm. As such, the court finds that a covered *windstorm is a windstorm of any force and turbulence which is capable of causing damage*. Id. See also Lane v. Cape Mut. Ins. Co., 674 S.W.2d 644, 645 (Mo. Ct. App. 1984) (holding that where an insurance policy does not specify the velocity of a covered windstorm, a covered windstorm is "a wind of any force causing damage").

The court finds that there are genuine issues of material fact in regard to whether a windstorm caused the collapse of the Switzer Building.[5] These issues include, but are not limited to, the velocity of the wind on July 19, 2006, in the vicinity of the Switzer Building; whether the wind speeds were so severe as to be capable of causing structural damage to properly maintained buildings; and what wind speeds are capable of causing masonry walls to collapse. As such, the court finds that summary judgment should be denied on the basis of whether a windstorm was a cause of the collapse of the Switzer Building.

**B.      Condition of the Switzer Building:**

Indian Harbor asserts that the collapse of the Switzer Building was caused by one or more of the causes specified in the Exclusionary Clauses of the Initial Policy; that even if a windstorm precipitated the collapse, the Switzer Building would not have collapsed absent conditions described in the Exclusionary Clauses; and that, therefore, coverage was properly denied. As stated above, Indian Harbor bears the burden of establishing that an Exclusion bars coverage. Kempker Construction, 71 S.W.3d at 235; Stockley, 168 S.W.2d at 600.

The court first will consider, as a matter of law, whether a windstorm need be the only cause of the collapse of the Switzer Building for Clarinet to recover. See Macheca, 463 F.3d at 832; Haulers Insurance, 170 S.W.3d at 545-46; Bartholomew, 882 S.W.2d at 175. In this regard the court notes that the Initial Policy includes collapse as a cause of loss and further provides for three types of exclusionary clauses. Paragraph B.1(a)-(h) *excludes* from coverage the causes specified in that paragraph *regardless of whether any other cause or event contributes*, concurrently or in sequence to, the loss. Indian Harbor does not assert that the Exclusions of Paragraph B.1 apply. Rather, Indian

[5]      Indian Harbor's Exhibit 64 sets forth differences in the opinions of the parties' experts.

Harbor invokes the Exclusions of Paragraphs B.2 and B.3 which provide, respectively, that if an excluded loss results in a Covered Cause of Loss, Indian Harbor will pay, and Indian Harbor will not pay where the loss results from one of the specified exclusions unless the excluded cause of loss results in a covered loss. The provision in Paragraph B.1 to the effect that *Exclusions apply regardless of whether a Covered Cause of Loss plays a part in the loss* and the *absence of such a provision in Paragraphs B.2 and B.3* indicates that the Exclusions of these latter paragraphs do not apply where a cause of loss is a Covered Cause of Loss. See e.g., Pace Props., Inc. v. Am. Mfrs. Mut. Ins. Co., 918 S.W.2d 883, 886 (E.D. Mo. 1996) (distinguishing between categories of exclusionary clauses which apply to losses "caused directly or indirectly" by specified events, "regardless of any other cause or event that contributes concurrently or in any sequence to the loss," which apply to losses "caused by or resulting from any of the following events," and which apply to "losses caused by or resulting from any of the following [events]").  As such, the court finds, as a matter of law, giving the Initial Policy its plain meaning and considering the Initial Policy in its entirety, that a windstorm, which is a Covered Cause of Loss, need not be the sole cause of the collapse of the Switzer Building for coverage to exist under the Initial Policy. See Rice by Rice v. Fire Ins. Exch., 897 S.W.2d 635, 637 (Mo. Ct. App. 1995) ("The policy is construed as a whole. [citation omitted]. In construing an insurance contract, the entire policy and not detached provisions or clauses must be considered.").

Moreover, to the extent the Initial Policy is ambiguous in regard to whether an Exclusion applies, where a Covered Cause of Loss is also a cause of loss, the court finds that this ambiguity must be resolved in favor of the insured, Clarinet. See Macheca, 463 F.3d at 832; Haulers Insurance, 170 S.W.3d at 546.

Even if the collapse of the Switzer Building was caused both by an Excluded Cause of Loss

19

and a windstorm, a windstorm must have been a direct cause, rather than a remote cause, for coverage to exist. See Rice, 897 S.W.2d at 637. Indeed, the Policy provides that Indian Harbor will pay for "direct physical loss of or damage to Covered Property." Missouri courts hold that the term "direct," as used in an insurance policy, relates to causal connection. See Boecker v. Aetna Cas. and Sur. Co., 281 S.W.2d 561, 564-65 (Mo. Ct. App. 1955) ("The term 'direct' as used in the policy relates to causal connection and is to be interpreted as the immediate or proximate as distinguished from the remote cause."). Thus, in the matter under consideration, to be a covered windstorm, the windstorm must have been a "substantial factor" in bringing about the collapse of the Switzer Building. See Buck v. Union Elec. Co., 887 S.W.2d 430, 433 (Mo. Ct. App. 1994) (citing Restatement (Second) of Torts, § 431) (citing Ricketts v. Kansas City Stock Yards Co. of Maine, 484 S.W.2d 216, 221-22 (Mo. banc 1972)).

In regard to whether coverage does not exist for the collapse of the Switzer Building because one or more of the Exclusionary Clauses apply, the court finds that there are genuine issues of material fact including, but not limited to, whether Clarinet's renovation was faulty or defective; whether the Switzer Building would have collapsed on July 19, 2006, even if the existing exterior walls of the building had been shored; whether the collapse was imminent in the absence of an unusually high wind force; whether Clarinet was compliant with the Building Code of the City of St. Louis; whether Clarinet took proper measures to forestall further deterioration of the Switzer Building during the renovation process; and whether the demolition and planned renovation of the Switzer Building was a direct cause of the collapse. As such, the court further finds that summary judgment should be denied on the issue of whether coverage does not exist because one or more of the Exclusionary Clauses apply.

**C.      Clarinet's Cooperation During the Claims Process:**

The Initial Policy required Clarinet to cooperate with Indian Harbor during the claims process.  In regard to whether Clarinet breached its duty to do so, Indian Harbor generally contends that its investigation focused on the condition of the Switzer Building prior to the storm and the nature and extent of the demolition that was performed during the renovation project; that this information was solely in the possession of Clarinet; and that Indian Harbor was prevented from obtaining information by Clarinet's conduct in failing to make full disclosure of information in its possession. Indian Harbor contends that it need not establish prejudice as a result of Clarinet's conduct to preclude coverage.  Indian Harbor further argues, alternatively, that it was prejudiced because it incurred "extensive time and costs investigating Clarinet's claim that it would not have incurred but for Clarinet's conduct of concealing and misrepresenting evidence." Doc. 76 at 14-15.  Indian Harbor acknowledges, however, that it requested documents in August 2006; that Clarinet "initially" provided partial compliance with its requests for relevant documents; that Clarinet *did provide a complete response* to Indian Harbor's requests for documents in late December 2006; and that all of the relevant project and engineering documents "consisted of thousands of pages of documents." Compl., ¶¶ 43-46.

In <u>Wiles v. Capital Indemnity Corp.</u>, 215 F.Supp.2d 1029, 1031 (E.D. Mo. 2001), the court held:

> "Cooperation clauses such as the one in question are valid and enforceable in Missouri." <u>Riffe v. Peeler</u>, 684 S.W.2d 539, 542 (Mo. App.1984) (citations omitted). ... "An insurer must prove (1) the existence of substantial prejudice and (2) the exercise of reasonable diligence to secure the insured's cooperation before it can deny coverage because of breach of a cooperation clause." <u>Hayes v. United Fire & Casualty Co.</u>, 3 S.W.3d 853, 857 (Mo. App.1999) (citing <u>Riffe</u>, 684 S.W.2d at 542).

"Missouri law clearly states that there is no per se rule for what constitutes a violation of [a] cooperation clause." The Med. Protective Co. v. Bubenik, 2008 WL 382384, at *5 (E.D. Mo. 2008) (unreported) (citing Hendrix v. Jones, 580 S.W.2d 740, 743-44 (Mo. 1979)).

In the matter under consideration, Indian Harbor has not suggested facts sufficient to meet its burden to establish that the alleged noncooperation of Clarinet created prejudice. See Midwest Oilseeds Inc. v. Limagrain Genetics Corp., 387 F.3d 705, 714, (8th Cir. 2004); Wiles, 215 F.Supp.2d at 1031. As such, Indian Harbor's argument that Clarinet is not entitled to coverage for the collapse of the Switzer Building based on Clarinet's noncooperation is without merit and summary judgment on this basis should be granted in favor of Clarinet.

## V.
## LIMITS OF COVERAGE

### A.    Functional Building Valuation:

It is undisputed that the parties intended to renew the insurance on the Switzer Building. The parties disagree, however, in regard to the applicable renewal terms. Clarinet contends that the Valuation of its recovery should be Functional Replacement Cost and that the applicable limit of coverage is $8,088,000 pursuant to the terms of the Initial Policy. Indian Harbor contends that if there is coverage the applicable Valuation is Functional Building Valuation as provided in Endorsement #1 of the Extension Policy. Indian Harbor further contends that, in the event there is coverage, the applicable limit of coverage is $588,000.

In regard to the terms of the Extension Policy, in a July 6, 2006 communication to PSG, Mr. Schuhler, of WKF&C, referenced *"FRC" for the existing structure and "RC" for renovation*. Further, Mr. Schuhler acknowledged that coverage was provided in accordance with PSG's

submission. On July 7, 2006, WKF&C communicated to PSG that coverage was bound and that the Policy Limit was $8,088,000 with the Valuation being Functional Replacement Cost for the existing building and Replacement Cost for renovations. The first time a Functional Building Valuation was referenced was after the Switzer Building collapsed.

The court in Resolution Trust Corp. v. American Casualty Co., 874 F. Supp. 961, 967 (E.D. Mo. 1995), held, in relevant part, that:

> [U]nder Missouri law, it is true that a renewal of an insurance policy constitutes a separate and distinct contract for the period of time covered by the renewal. DeWitt v. American Family Mut. Ins. Co., 667 S.W.2d 700, 705 (Mo. banc 1984); Rice v. Provident Life & Accident Ins. Co., 102 S.W.2d 147, 151 (Mo. Ct. App.1937). However, a renewal is also considered a contract with the same terms and conditions as those contained in the policy which is renewed. Hester v. American Family Mut. Ins. Co., 733 S.W.2d 1, 2 (Mo. Ct. App.1987); Rice, 102 S.W.2d at 151.

Indeed, there is no evidence suggesting that Functional Building Valuation was ever mentioned to either PSG, Affiliated or Clarinet until Indian Harbor provided Endorsement #1 of the Extension Policy after the collapse of the Switzer Building. The court finds, therefore, that the undisputed facts establish that Functional Building Valuation is not applicable to any portion of Clarinet's claim. See Resolution Trust, 874 F. Supp. at 967.

**B.    Valuation and Policy Limits:**

The court finds that there is a genuine issue of material fact in regard to Valuation and Policy Limits. These disputed facts include, but are not limited to, whether Clarinet accepted Indian Harbor's offer of the terms of the Extension Policy; whether the terms to which the parties agreed, if they agreed, are those as specified in Mr. Schuhler's July 6, 2006 communication to PSG, in the July 6, 2006 Cover Note, in Quote #16772A, and/or in the July 7, 2006 Binder; whether Functional Replacement Cost is applicable to the Existing Building; what the limit of coverage applicable to the

Existing Building is; whether Replacement Cost is applicable to Renovations; and whether Affiliated and/or PSG were acting as Clarinet's agent for purposes of accepting policy terms.

The court further finds, to the extent agreements between Indian Harbor and Clarinet and/or Clarinet's agent[s] prior to July 19, 2006, changed the terms of the Initial Policy, the changed terms are controlling.[6] See Resolution Trust, 874 F. Supp. at 967. On the other hand, to the extent that agreements did not change the terms of the Initial Policy, the Initial Policy is controlling. See id.

Indian Harbor argues that its Chicago office mistakenly wrote $8,088,000 as the policy limit in the Functional Replacement Cost Endorsement of the Initial Policy and, based on this scrivener's error, this provision is not binding. Indeed, the equitable doctrine of laches does not bar reformation of an insurance contract containing a *mutual mistake*. See Kopff v. Econ. Radiator Serv., 838 S.W.2d 449 (Mo. Ct. App. 1992). The court, however, finds that there is a genuine issue of material fact as to what the intent of the parties was in regard to the Initial Contract's policy limit in the Functional Replacement Cost Endorsement. Thus, there is a genuine issue of material fact as to whether there was a mutual mistake in the Functional Replacement Cost Endorsement of the Initial Policy.

To the extent the parties established, subsequent to the expiration of the Initial Policy and prior to the collapse of the Switzer Building, a policy limit applicable to Functional Replacement Cost the alleged scrivener's error in the Initial Policy is of no consequence. See Resolution Trust, 874 F. Supp. at 967.

**C.     Rebuilding - Functional Replacement Cost Valuation:**

---

[6]     As stated above, the Functional Building Valuation provision of Endorsement #1 is not applicable under any circumstance.

Indian Harbor argues, alternatively, if Functional Replacement Cost is applicable, that Clarinet cannot recover until such time as it builds a new building. The court has found above that the Initial Policy is controlling to the extent terms of the Extension Policy were not addressed prior to the collapse of the Switzer Building. To recover on the Functional Replacement Cost basis the Initial Policy provides that Clarinet must actually replace the Switzer Building with a new structure; replacement is a condition precedent to recovery. As stated by Clarinet, strict interpretation of this provision provides a "Catch 22" for Clarinet.

Upon addressing a provision in an insurance policy which required rebuilding prior to recovery, the Supreme Court of Iowa noted in Conrad Brothers v. John Deere Insurance Co., 640 N.W.2d 231, 240 (Iowa 2001), that:

> The reason insurers place this provision in insurance policies is to prevent an insured from making a profit from a loss. [citations omitted]. When a policy distinguishes between coverage for actual loss, which considers depreciation as a component to value, and the cost of rebuilding, which does not consider depreciation, an insured can profit by receiving replacement costs which are not then used to replace property which depreciated in value prior to the loss. ...
>
> It is widely recognized that "a party may not rely on a condition precedent when by its own conduct it has made compliance with that condition impossible." State Farm Fire & Cas. Ins. Co. v. Miceli, 164 Ill. App.3d 874, 115 Ill. Dec. 832, 518 N.E.2d 357, 362 (1987). This rule has been frequently applied to insurance contracts. Id. In fact, several courts have excused performance by the insured when the insurer's conduct actually prevented the insured from rebuilding the damaged property. .... Courts often hinge their findings of excuse on the insurer's bad faith or deceitful conduct towards the insured during the claims process. ... Yet, in finding an excuse, courts have universally based their determination on the *theory of impossibility* or frustration of performance. Ward v. Merrimack Mut. Fire Ins. Co., 332 N.J.Super. 515, 753 A.2d 1214, 1218 (2000) (even if the insured asserts or the court mentions estoppel, the courts generally resolve the issue on the impossibility theory);

(emphasis added).

In the matter under consideration, if Functional Replacement Cost is applicable to Clarinet's

recovery, it would be impossible for Clarinet to build a new building prior to Indian Harbor's paying. As such, in the event it is determined that Functional Replacement Cost is applicable to Clarinet's recovery, the court finds that Clarinet is not required to build a new building prior to recovering on a Functional Replacement Cost basis. <u>See</u> <u>Conrad</u>, 640 N.W.2d at 240.

**VI.**
**CONCLUSION**

As set forth in detail above, the court finds that there are genuine issues of material fact in regard to whether coverage exists and in regard to policy limits. The court finds, therefore, that Clarinet's Motion for Partial Summary Judgment in Regard to Limits and Motion for Partial Summary Judgment in Regard to Coverage and Indian Harbor's Motion for Summary Judgment should each be denied.

Accordingly,

**IT IS HEREBY ORDERED** that the Motion for Partial Summary Judgment as to Coverage and the Motion for Partial Summary Judgment as to Policy Limits filed by Clarinet are **DENIED**; Doc. 59; Doc. 61

**IT IS FURTHER ORDERED** that the Motion for Summary Judgment filed by Indian Harbor is **DENIED**. Doc. 69

> /s/Mary Ann L. Medler
> MARY ANN L. MEDLER
> UNITED STATES MAGISTRATE JUDGE

Dated this <u>17th</u> day of February, 2009.